Filed 3/27/15  Marriage of Katz CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Marriage of KAREN and MARTIN D. KATZ. | B245702 |
| | (Los Angeles County Super. Ct. No. BD458191) |
| KAREN KATZ, Appellant, v. MARTIN D. KATZ, Appellant. | |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Frederick C. Shaller, Judge.  Affirmed.

Freid and Goldsman, Melvin S. Goldsman and Gary J. Cohen for Appellant Karen Katz.

Martin D. Katz, in pro. per., for Appellant Martin D. Katz.

————————————

Both parties to a marital dissolution action appeal from a postjudgment order awarding the wife needs-based attorney fees and costs, pursuant to Family Code sections 2030 and 2032.[1]  In her appeal the wife maintains the award of $200,000 was too low, in light of the economic disparity between the parties, the court's findings that almost $959,000 in legal fees and costs she incurred were reasonably necessary to maintain and defend the action, and its conclusion that the husband's conduct was largely responsible for escalating the cost of the litigation.  By his cross-appeal the husband contends the trial court erred in:  (1) awarding the wife more than $75,000 in attorney fees and costs; (2) refusing to enforce the wife's agreement to indemnify him for a $15,000 payment he made to her attorneys; and (3) concluding it retained jurisdiction to make a further award notwithstanding the wife's waiver of the right to recover fees and costs after a date certain.  We conclude that none of the parties' contentions has merit, and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Karen Katz and Marty Katz[2] were married on March 16, 1991.  They separated on January 2, 2007.  The couple have three children, born in 1991, 1993 and 1995.  Marty is a litigation partner at a major law firm in Los Angeles.  Karen did not work outside the home during the marriage, and remained unemployed thereafter.  A judgment of dissolution was entered on July 28, 2011, following trial on the first phase (phase I) of this bifurcated proceeding.  That judgment resolved property, custody, support and related issues, and incorporated various stipulations and court orders.  The issue of attorney fees and costs was bifurcated, and reserved for a separate (phase II) trial originally scheduled to begin September 12, 2011, and thereafter continued several times.  The phase II trial ultimately took place over the course of 12 days, three days in

_____

[1] All further statutory references are to the Family Code unless otherwise indicated.

[2] For the sake of clarity, and consistent with the designations used at trial, we refer to the parties by their first names.

2

December 2011, eight in July 2012, concluding with a day of argument on August 1, 2012.

*The parties' legal representation in this action*

Karen was represented by several firms during the first year in which this dissolution action was litigated. Her first attorneys were replaced within days by Phillips, Lerner, Lauzon & Jamra (the Phillips firm), which was in turn replaced by Gerald Friedman in October 2007. Family Law specialists, Freid and Goldsman, a Professional Law Corporation (Freid and Goldsman) associated in in December 2007, and ultimately assumed Karen's representation.

Marty was represented from the outset by the Law and Mediation Offices of Heidi S. Tuffias, Family Law specialists. Notwithstanding that specialized representation and his own lack of expertise in Family Law, the trial court observed that Marty consistently "acted as his own attorney in all aspects of the case," and was "involved in nearly every aspect of the litigation." In March 2009 Marty formally associated in as his own cocounsel.

*Karen's legal fees and costs prior to Freid and Goldsman's representation*

Karen paid $142,000 for legal services rendered on her behalf by the firms and individuals prior to the time Freid and Goldsman undertook her representation. On August 24, 2007, the trial court ordered Marty to contribute $50,000, in installments, to Karen's legal expenses to be paid directly to the Phillips firm. Of that amount, Marty paid $35,000 to the Phillips firm, but refused to pay the rest.

In October 2007, before being replaced by Friedman, the Phillips firm filed a "*Borson* motion"[3] seeking to have Marty pay the firm the remaining $256,226 owed by Karen (of the firm's $372,271 bill). As part of that motion the Phillips firm specifically

---

[3] *In re Marriage of Borson* (1974) 37 Cal.App.3d 632, held that attorneys, discharged while an action is pending may, with the former client's consent, file a motion for their attorney fees. The fee issue can be resolved at a hearing on the motion, or the court may reserve jurisdiction to make an award at trial. (*Id.* at pp. 637–638.)

requested that the trial court order Marty to pay the remaining $15,000 due under the August 24, 2007 order.

On January 16, 2008, pursuant to a stipulation between the parties and adopted by the court, Marty was ordered to pay "the remaining $15,000 of his contributive share of [Karen's] attorneys fees directly to [Karen] . . . . This payment shall discharge the Court's prior order of August 24, 2007 re contributive share. [Karen] shall indemnify [Marty] against any claims made by [the Phillips firm] against [Marty] for said $15,000." The stipulation did not mention the [pending] *Borson* motion. At the phase II trial Marty sought unsuccessfully to have the court offset any award of attorney fees to Karen by the amount of this indemnity agreement. He claims the court erred in this respect, a contention we address in section 2 of our discussion of the cross-appeal below.

*Karen's legal fees and costs incurred during Freid and Goldsman's representation*

The principal issue during the 11-day phase II trial was whether and in what amount Marty should be required, pursuant to sections 2030 and/or 271, to contribute for attorney fees and costs Karen incurred during her representation by Freid and Goldsman from December 28, 2007 through August 25, 2011.[4]

The evidence at trial revealed that during the relevant period, Freid and Goldsman billed a total of 2,246 hours, at an average hourly rate of $526.36 per hour, for a total balance of $1,210,390. Of this total, the trial court found that 478 hours were unreasonably billed, reducing the amount owed by $251,600, to a total balance of $958,790.

As to the $958,790, the trial court devoted the majority of its incredibly thorough 29-page final statement of decision (SOD) to explaining why most of the services billed by Freid and Goldsman were reasonable and necessary for Karen's representation in this

---

[4] There is also a dispute as to whether August 25, 2011 should be the cut-off date for any fee recovery. That issue is addressed in section 3 of the cross-appeal.

4

action, notwithstanding its conclusion that both sides "aggressively over-litigated" the case.

As discussed in more detail below, the court found that Karen—who did not work outside the home for the duration of the marriage and who remained unemployed—had a need for contribution, that Marty—who had earned approximately $2 million in 2011—had the ability to pay, and that this "non-complex" case was over-litigated due primarily to Marty's conduct. Although Marty, "a skilled and highly compensated civil litigation lawyer (who is also a partner at a premier entertainment law firm[])," was consistently represented by family law specialists, he insisted on being "involved in nearly every aspect of the litigation," and "acted as his own attorney in all important aspects of the case including strategy, negotiation, filing motions and OSC's, presentation of evidence and argument at trial, motions and OSC's." The court found that Marty pursued issues and strategies and adopted litigation postures which "conflicted with sound objective judgment" and "often led to overreaching, frivolous, unproductive, and aggressive positions not supported by Family Law cases or practice." Marty's aggressive domination and micro-management of the litigation necessitated responses and counter-arguments from Karen and greatly increased her litigation fees and expenses. Marty was ordered to pay $180,000 of Karen's attorney fees and $20,000 in costs. The needs-based award was made pursuant to section 2030.

Karen timely appealed, challenging the attorney fees award as too low. Marty cross-appealed, arguing that the trial court should have limited Karen's attorney fees to $75,000, erred in failing to enforce the parties' January 16, 2008 indemnity agreement, and erred in failing to uphold Karen's waiver of the right to seek attorney fees after August 25, 2011. Additional facts relevant to Marty's cross-appeal are set forth in section II below.

DISCUSSION

## I.    *Karen's appeal*

We turn first to Karen's argument that the attorney fees award must be reversed because, under the circumstances, the trial court abused its discretion by requiring Marty to pay Karen only $200,000 of what it acknowledged were $958,790 in reasonably incurred attorney fees and costs.

### 1.    *Standard of review and controlling law*

In a marital dissolution action a trial court's decisions whether and in what amount to award attorney fees and costs is reviewed for abuse of discretion.  (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283 (*Cheriton*).)  That decision will not be disturbed on appeal unless a clear showing of abuse of discretion is made.  (*Ibid*.)  In short, we must affirm unless no judge reasonably could make such an order.  (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 406 (*Dietz*); *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 630.)

"Pursuant to Family Code sections 2030 and 2032, the trial court is empowered to award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action.  It is entitled to take into consideration the need for the award to enable each party to have sufficient financial resources to present his or her case adequately.  In assessing a party's relative need and the other party's ability to pay, it is to take into account ""'all evidence concerning the parties' current incomes, assets, and abilities.'""  [Citation.]"  (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974–975, fn. omitted (*Falcone*).)  Specifically, section 2032, subdivision (b) directs the court to take into consideration the circumstances of the respective parties described in section 4320, which identifies factors to be considered in ordering spousal support.[5]  Both the making of the award and its amount must be "just

---

[5] Section 4320 factors generally relevant here include:

and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a); *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827 (*Braud*); see *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1056 [§ 2032 requires court to engage in broad analysis of parties' relative circumstances].)

Relative need and ability to pay are not the only considerations in fixing the amount of a "just and reasonable" fee award. In determining a "reasonable" fee award, trial courts also take into account factors such as the nature and complexity of the litigation, the skill required and employed to handle the litigation, the success of counsel's efforts, litigation costs incurred and expected to be incurred to conclude the case, and the amount of time consumed. (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870 (*Keech*); *Braud*, *supra*, 45 Cal.App.4th at p. 827; *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 884.)

---

"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:  [¶] . . . [¶]

"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.  [¶] . . . [¶]

"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets . . . of each party.

"(f) The duration of the marriage.  [¶] . . . [¶]

"(h) The age and health of the parties.  [¶] . . . [¶]

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.  [¶] . . . [¶]

"(n) Any other factors the court determines are just and equitable."

7

No particular language is required in an order awarding needs-based attorney fees. However, the record must reflect an actual exercise of judicial discretion and consideration of the statutory factors in the exercise of that discretion. (See *Cheriton*, *supra*, 92 Cal.App.4th at p. 315; *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 242, 254–255 (*Alan S.*).) The purpose of section 2030 is to ensure parity. "The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength." (*Alan S.*, at p. 251.)

2. *The trial court's analysis under sections 2030, 2032 and 4320.*

   a. *Income disparity and ability to pay*

When an award for needs-based attorney fees and costs has been requested, the trial court must make findings as to (1) whether an award is appropriate; (2) whether there is a disparity in the parties' access to funds to retain counsel, and (3) whether one party can pay for both parties' legal representation. If the findings demonstrate a disparity in the parties' access to funds and ability to pay, the court must award attorney fees and costs. (§ 2030, subd. (a)(2).)

Here, the court found a large disparity in the parties' access to funds to pay for legal representation. Marty is high income earner who earned about $2 million in 2011. Karen was unemployed. Further, "[w]hen the parties divided the community estate as a result of pre-trial distributions of assets or in sale of the home, Karen used a substantial portion of those sums to pay attorney's fees and costs whereas Marty paid his much lower attorneys fees from cash flow" and accordingly, Marty was able to pay both his and Karen's legal fees.

The court considered the relevant factors in determining the propriety of the fee award. Specifically factors considered included: (1) the nature of the litigation; (2) the factual and legal complexity of the action; (3) how much time the parties expended; (4) whether particular investments of time were reasonable; (5) the expertise and skill of counsel; (6) the intricacies and importance of the litigation; (7) the necessity for skilled Family Law specialists; (8) responsibilities undertaken by counsel; and (9) the parties'

8

respective needs and ability to pay.  (See *In Re Marriage of Cueva* (1978) 86 Cal.App.3d 290; *Keech*, *supra*, 75 Cal.App.4th 860; *Alan S.*, *supra*, 172 Cal.App.4th 238.)  We discuss the court's findings on these factors in turn.

     *b.       The nature and complexity of the litigation*

The trial court observed that, apart from valuing Marty's "goodwill" interest in his law firm, the issues in this dissolution action would not have been legally or factually complex, had they been handled in "a usual manner in Family Court."  The case, however, was "highly unusual," and issues became "complex, convoluted and protracted" due to the parties' tenacious litigiousness.  "A major factor" favoring a fee award to Karen was the court's finding that Marty—though continually represented by Family Law specialists and lacking personal expertise in Family Law—insisted on micro-managing virtually every aspect of the litigation.[6]  As a result, "litigation expenses became unreasonably high when Marty pursued issues and strategies and took litigation positions which were often at conflict with sound objective judgment and which greatly enhanced Karen's litigation fees and expenses."

Marty's litigation tactics "often led to overreaching, frivolous, unproductive, and aggressive positions not supported by Family Law cases or practice but always resulting in a counter-reaction from Karen that had significant financial consequences in terms of the amount of fees and costs incurred."  He increased the complexity of the action—concomitantly decreasing the possibility the parties could reach mutually agreeable terms without litigation—largely by insisting on "tying . . . reasonable requests to which Karen might likely agree without litigation to a host of sub-requests" to which no reasonable litigant would agree.  In some instances the court found that Marty's overreaching and

---

[6] The court observed that the family law attorneys Marty retained were either unable or unwilling to prevent Marty from micromanaging the litigation, the postseparation relationship between the parties and/or their children, or to "protect Karen or the court from Marty's domineering conduct."

assumption of frivolous, unproductive, and aggressive positions was driven by nothing more than his desire to maintain control or win.

The court found Marty adopted legal positions "which had marginal arguable merit but carried with them a very high amount of legal fees by Karen who was forced to defend [against] them because the positions all favored Marty." Illustrative examples included: (1) Marty's insistence that Karen's right to spousal support terminate after a short number of years, notwithstanding the parties' long-term marriage and Karen's lack of employment; (2) Although the children were successful and relatively content under parties' existing custody arrangement, Marty forced a trial on the issue of his entitlement to an additional weekday overnight "for no reasons the court could determine were child oriented"; (3) Marty's insistence on maintaining possession of and deferring sale of the family home until the parties' youngest child graduated from high school for reasons the court found "had no discernable benefit to the children," but which greatly prejudiced Karen; and (4) Marty's insistence that several whole life insurance policies purchased during the marriage, which could only have been community property, were his separate property because he placed the policies in his name.

A pivotal result of Marty's involvement in all aspects of the case was that the parties were able to reach agreements and stipulations only after "intricate negotiations which painfully extracted a quid pro quo on nearly every issue." The court found that Marty's "tenacity, resoluteness, and enterprising negotiations and agreements," while arguably worthy of hard-nosed litigation, "were counterproductive in the marital dissolution setting where Karen had to meet the challenge by equally gifted and motivated counsel. The net result was extremely out of control litigation costs that could have been avoided."

    *c.    Hours expended*

The record reflects that between December 28, 2007 and August 25, 2011, Freid and Goldsman billed Karen for 2,246 hours, at an average hourly rate of $526.36, a total of $1,210,390. Marty's experts devoted considerable time at trial to testifying about the

10

unreasonableness of Karen's fees. The court found those experts "not credible" for the most part; they lacked appreciation for family law or the extent to which Marty's conduct itself drove up litigation expenses. The court rejected Marty's objection to Freid and Goldsman's billing for research as to which the explanation for time spent was redacted based on privilege. It found the redactions appropriate and the amount of time devoted to the tasks eminently reasonable. The court also rejected Marty's assertion that Karen was overbilled because Freid and Goldsman often sent multiple attorneys to represent her at meetings, hearings, trial, and other proceedings. Because of the complexity of the issues being addressed at a given time, and the "formidable opposition" posed by Marty's personal involvement, and his aggressive litigation tactics and novel approaches to issues, the court found Freid and Goldsman appropriately dispatched multiple attorneys on some occasions.

The court did find, however, that 478 hours were unreasonably billed, and reduced Karen's bill by $251,600.[7] As of the date trial began, December 20, 2011, Marty's attorneys had billed him for $225,659 in attorney fees (571 hours at $395 per hour).[8] The court found the four-to-one facial differential between the parties' respective legal bills misleading. Karen's bills did not include fees and costs she incurred during months of litigation before Freid and Goldsman became involved. More importantly, the differential did not account for fact that Marty's bill did not include the multitude of hours he devoted to the litigation himself, for which there were no time records. On balance, based on the evidence and inferences drawn therefrom, the court concluded it

---

[7] While the court's calculation does not align directly with its itemized reductions for particular tasks, its overall calculation (number of hours overbilled multiplied by average hourly rate) is correct. In any event, the discrepancy (whether there should have been an additional reduction of either $478 or $348) is minimal and neither party takes issue with the court's calculations.

[8] This amount was also miscalculated, but the minimal difference ($114) is not at issue.

was "clear . . . that Marty's actual time expended on the litigation in the role of an advocate added to that he paid to his co-counsel [was] near or equal to the time spent by Karen's attorneys."

### d. Reasonableness of attorney time devoted to particular tasks

Over 14 of 29 pages of the trial court's thorough and well-reasoned SOD are devoted to its exhaustive discussion of whether Karen's fees were reasonably incurred as to 18 discrete issues or tasks. While we need not repeat that excellent exposition, a summary is in order in light of Karen's contention that the court's minimal (in her view) fee award was an abuse of its discretion.

### (1) Marty's four motions filed on December 21, 2007

On December 21, 2007, in a move the court found "tactically timed" to capitalize on the fact that Karen was in the midst of substituting counsel, Marty filed two motions to compel discovery, a motion to compel Karen to submit to a vocational rehabilitation examination and an OSC regarding custodial issues and certain child-related expenses. Hearings on all four matters were scheduled for January 16, 2008, about two weeks after Freid and Goldsman became Karen's counsel of record.

### (i) Motions to compel discovery and a vocational exam

As the court details, Marty's discovery demands were overreaching, overbroad and sought production of obviously privileged materials. Although Marty's request for billing records was legitimate, his requests were "significantly overreaching," and necessitated defensive action by Karen. Further, Karen's new counsel needed adequate time to prepare to defend their client's position and get up to speed on the facts and pertinent law, and their appearance at the January 16, 2008 hearing and negotiation that day of a stipulation and protective order was "crucial" to Karen's ability to maintain privilege. The court found the time billed (about $31,000) related to the opposition to and hearing on these motions was reasonable and necessary.

As for Marty's effort to compel Karen to submit to an audiotaped vocational rehabilitation exam, the court found that motion incomplete, overbroad and overreaching.

12

It was also probably unnecessary given that Karen had never denied that Marty was entitled to such an examination. The motion sought clearly inadmissible evidence (the report is hearsay), contained significant omissions (such as who would pay for the examination), and was filed prematurely without an adequate effort to try informally to resolve the issues. In addition, although audiotaping of vocational exams is permitted, the procedure is "unusual" and Karen legitimately viewed the request as harassing and unreasonable. The court found she was entitled to determine whether Marty's request to tape was made for an improper purpose. Indeed, the court later determined that Marty's purported justification for audiotaping the examination (viz., Karen's request to "'reserve foundational objections'") was nonsensical and irrelevant to the exam. The court found Karen was "fully justified" to oppose the motion, which the parties were unable to settle before the hearing.

### (ii)    The OSC

Marty's OSC requested various orders, some of which the court found reasonable (i.e., requests related to the children's 2008 Spring break, authorizing travel abroad and for a custody order for two weeks in February 2008). However, the OSC also presented complicated custodial and financial issues, the latter of which were very controversial. Marty is a high income earner, and Karen is unemployed and depends on spousal and child support to pay her expenses and the children's. The court found Karen's opposition to the OSC justified in light of the fact that she agreed to pay half of the expenses enumerated by Marty, so long as he bore half of other expenses she had paid for the children (i.e., nontuition related educational expenses, such as tutoring, tutoring books, test fees and prep courses). Further, Karen reasonably opposed Marty's request to reduce his support obligation by changing the parties' custodial time-share. The court found Marty's request was "clearly improperly motivated" by financial concerns, not a desire to achieve a time-share arrangement that served the children's best interests.

The court determined that the hearing on the OSC was unavoidable because Marty rejected Karen's compromise offer. The court also found the OSC was an attempt by

13

Marty to obtain additional time with the children in trade for an offer to relieve Karen of certain financial responsibilities, placing her in the untenable position of having to choose between custody and money.

(2)    *Fees incurred in connection with the January 16, 2008 hearing, negotiations and stipulation*

The court found that with the exception of an inadvertent omission,[9] and the addition of provisions for division of one asset (Schwab account), the January 16, 2008 stipulation reflected the parties ultimately agreed to positions "substantially identical to the primary positions taken by Karen in her oppositions." Accordingly, the court found that time spent by Karen's attorneys on the oppositions and appearance at the hearing was reasonable, successfully narrowed Marty's requests and protected against disclosure of privileged material. The court also found that Marty's simultaneous filing of four motions to be argued the same day, "was the legal equivalent of a battleship broadside." Those filings, which were overbroad, overreaching and "in some instances bordering on improper in purpose," were strategically timed to coincide with the impending substitution of counsel, and raised complex issues that required the concerted effort and attention of both attorneys who attended the January 16 hearing and participated in that day's negotiations, which resulted in achieving a stipulation.

(3)    *Fees incurred in connection with Karen's April 17, 2008 OSC*

At some point Karen realized the January 16, 2008 stipulation did not include a provision to which she believed Marty had agreed, namely, that she would pay half the cost of the children's summer programs if he paid half their extracurricular expenses. She filed this OSC seeking a court order to reflect this understanding.

The court found Marty's objection to the OSC—he did not believe he had struck such an agreement—reasonable. But Marty took the matter further, escalating the

---

[9] The stipulation omitted Karen's condition that Marty be required to bear half the cost of the children's educational expenses unrelated to tuition.

14

disagreement by unnecessarily including in his opposition "a litany of extraneous . . . and somewhat harsh and accusatory rhetorical attacks rationalized as explanations as to why he would not have agreed to such an order." The opposition demonstrated Marty was "heavily invested" in maintaining control over the children's extracurricular expenses and unwilling to compromise. Karen's reply was therefore necessary to redirect the court's attention to "the fact that regardless of Marty's opinions, there was agreement and the proposed order was reasonable in light of the parties' net spendable income." The court found the fees Karen incurred in connection with the OSC reasonable. Although the fees were steep, they had been made so by Marty's conduct. The dispute over reimbursement issues was protracted because the parties fundamentally disagreed about expenses Karen incurred for the children which Marty believed were inappropriate and reflected Karen's unilateral parenting choices. The parties could not resolve these issues until mid-June 2010, when they reached a global settlement of reimbursement claims, support arrears and camp expenses. Accordingly, the court found that Karen's attorney fees and costs relating to her OSC were reasonable because they related directly to custody and the parties' respective rights to make educational and lifestyle decisions for their children.

(4)     *Fees incurred in connection with Karen's April 24, 2008 ex parte application and Marty's April 28, 2008 OSC*

On April 24, 2008, Karen filed an ex parte application seeking court permission to travel with the children to Bora Bora in June.

Four days later Marty filed his own OSC asking the court to deny Karen's ex parte application, and seeking further orders related to: (1) division of custodial time between the time the children returned from camp and the start of school; (2) Father's Day; (3) travel outside California and the United States; (4) the children's birthdays; and (5) complicated alternate orders regarding summer visitation in the event the children attended extended summer camp or summer abroad programs during summer.

The court found that Karen's ex parte application was "unnecessary" and "an obvious attempt to upstage Marty," who had plans to take the children on the same

15

Tahitian trip later that year. Ultimately, but only after "expend[ing] a great deal of effort in negotiating the highly disputed custody arrangement," the parties were able to reach a stipulated agreement resolving most of the issues raised in the ex parte application and OSC. The court observed that, ordinarily, it would have been unreasonable to require Marty to pay any fees in connection with Karen's ex parte application. But Marty complicated matters himself by filing an OSC linking Karen's ex parte application to complex custodial issues. Because Marty so complicated the issues, the court found Karen had reasonably incurred a high percentage of custody related fees.

   (5) *Marty's motion to exclude Karen's expert from testifying and for issue sanctions*

  On March 13, 2008, Marty served a Code of Civil Procedure section 2034.210 demand for exchange of expert witnesses and reports. At the time, trial was set for May 27, 2008. Marty demanded that Karen's expert materials be produced by April 7, 2008. Karen's counsel responded, advising Marty that on October 7, 2007, the court had ordered that the experts' materials be exchanged "'at least'" 30 days before trial, which would mean they were due April 25, 2008. Karen identified three expert witnesses on April 7 but produced no reports.

  On April 15, 2008, Marty filed a motion seeking to preclude Karen's expert (Blumenthal) from testifying due to her failure timely to produce his reports. (Code Civ. Proc., § 2034.210, subd. (c).) He also sought issue sanctions precluding Karen from putting on certain evidence at trial, and sanctions (or a trial continuance) due to Karen's allegedly inadequate responses to certain discovery. Marty argued that his Code of Civil Procedure section 2034.210 request had usurped the court's October 2007 order and, in any event, did not contradict that order which required only that reports be produced "'at least'" 30 days before trial. Marty also argued that Karen's failure to produce the expert reports was tantamount to sandbagging and precluded him from designating a timely supplemental expert.

Karen opposed the motion arguing her failure to disclose reports was not unreasonable due to confusion over the October 2007 order. She noted that Marty was not entitled to seek exclusionary sanctions in light of his own failure to comply with a production demand. Finally, she argued that even if she had failed to comply with the demand for disclosure of expert witness reports or provided inadequate discovery responses, Marty could not obtain issue sanctions without a prior court order.

The court never resolved this dispute. Instead, on April 30, 2008, the parties reached a stipulation which gave Karen more time to provide reports, gave Marty additional time to designate rebuttal experts and left the May 27, 2008 trial date in place. The court found that the amount of attorney time devoted to this motion was reasonable. The fact that the parties were able to reach a stipulation on these issues did not negate the necessity for each to advocate his or her position as to the significant sanctions sought in Marty's motion.

(6) *Karen's May 20, 2008 ex parte application to strike Marty's supplemental designation of experts*

Shortly before trial was set to begin Marty designated seven new expert witnesses. In her ex parte application, Karen argued the designations violated Code of Civil Procedure section 2034.210 et. seq., and the April 30, 2008 stipulation. As of May 20, 2008, neither party had deposed the other's experts, and Marty's new experts were not yet ready to be deposed. Again, the parties reached a stipulated solution by taking pending motions regarding experts off calendar, scheduling experts' depositions, and continuing the trial to June 16, 2008.

The court found both parties at fault because neither was ready for trial on May 20, 2008, due to lack of expert witness disclosure. It found the attorney fees incurred by Karen relative to "this very important issue were reasonable and necessary as the confusion over the ability/right to present expert opinion evidence at trial was at stake as was potential issue preclusion. Such potential sanctions justified extreme efforts to

17

preserve Karen's rights to present evidence including making a counter-motion to exclude Marty's experts."

*(7)    Preparation for the phase I trial (original dates)*

The trial was continued at the last minute. Numerous hotly contested matters remained unresolved, including disposition of the family home, custody, attorney fees and reimbursement issues and spousal support. Both parties argued the other had acted unreasonably, driving the amount of attorney fees and costs significantly higher: Karen complained that Marty had taken a """"scorched earth"""" approach to the dissolution action by propounding excessive discovery and adopting unreasonable positions. Marty complained that the conduct of Karen's counsel and the fact that she changed attorneys multiple times, drove the cost of the litigation excessively high. Given the significant disagreement between the parties on pivotal issues, and the fact that the continuance occurred so close to trial, the court found Karen's attorney fees and costs and the expenditure of 157 hours in trial preparation both reasonable and appropriate.

*(8)    Marty's July 17, 2008 OSC regarding additional custodial time*

By this motion, Marty requested a modification of the custody order to give him additional overnight visitation with the children on alternate Thursday nights. Both parties again took issue with the one another's parenting philosophies. Marty took the position that he was a model parent during custodial visits, and Karen had strategically undermined his parenting time and alienated the children against him. Karen defended her parenting style and claimed the children did not want to be with their father who had neglected them for years and had taken no steps to strengthen his relationship with them.

The issue of modification of the custodial relationship was not resolved until trial. The court found Marty's character attacks on Karen unfounded. It also found that Marty sought additional custodial time for his own vague and purely subjective reasons, not because the arrangement was best for the children. In essence, the court found that impetus for Marty's OSC on the custody issue, and fees incurred in connection with that issue, was "another example of overreaching and borderline harassment by Marty."

18

Accordingly, it found the fees and costs Karen incurred in successfully opposing this motion were reasonable and necessary.

(9)     *Karen's December 5, 2008 OSC regarding management and control of the life insurance policies*

By this vigorously contested motion Karen sought to liquidate several whole life insurance policies in order to pay off a significant amount of attorney fees and costs (about $270,000 at the time) and substantial credit card debt she had incurred. She also sought a contribution of $75,000 from Marty for prospective fees and costs.

In response, Marty raised a multitude of arguments as to why Karen should neither receive a contribution for attorney fees and costs, nor be permitted to liquidate the insurance policies. He argued: (1) she received adequate spousal support which put the parties on equal footing; (2) she got herself into debt by her inappropriate "spending choices"; (3) he had already paid $50,000 for attorney fees and costs; (4) Karen had received $139,000 in postseparation distributions; (5) he could not afford to pay Karen's fees; (6) he funded the insurance policies as the "sole savings vehicle for college for the girls"; (7) he paid for the automobile lease and insurance on the community vehicle Karen used post separation; (8) he had only $5,000 in liquid assets; (9) no fees were reasonably necessary because the community estate was worth only $3.75 million or less; and (10) more money would have been available if Karen had cooperated with regard to selling the family home.

Karen responded that Marty's "litigious conduct" was the driving force behind the litigation, and his conduct was the direct cause of the unreasonably high fees, costs and expenses. This issue was extensively briefed, but not decided until trial.

After trial, the court rejected Marty's contention that the insurance policies were "almost sacrosanct because . . . they represented savings that were to be used for his daughters' college education." The court found that Karen had credibly testified she honestly believed Marty never earmarked the policies for the children's college education, a belief buttressed by "Marty's huge income which is sufficient to cover

19

tuition for the three children at the times that they were projected to attend college." The court found Karen was justified in filing a motion to gain control over the insurance funds in light of Marty's legally unjustified attempt to characterize the policies as his separate property, the "strident protective tone" he adopted regarding preserving the funds for the children (which Karen considered a ruse), and the fact that he personally handled and created much of the litigation. Further, funds from the insurance policies represented a means by which Karen could equalize the fairness of the litigation in light of the fact that Marty was "systematically fighting legal battles over many issues to which Karen was required to respond without a source of income other than her support." Accordingly, the court found the fees and costs Karen incurred in her effort to gain control over the life insurance funds were reasonable.

*(10)    Marty's February 3, 2010 ex parte application regarding expert witness issues*

By this application Marty sought: (1) exclusion of certain expert witness evidence, (2) to take expert depositions before trial, (3) more time for his rebuttal expert to prepare, and (4) sanctions. The motion, which the court deemed reasonable, was prompted by Karen's untimely production of 20 expert reports on February 1, 2010, when trial on relevant issues was set to begin four days later.

The motion, though reasonably brought, was denied without prejudice. Nevertheless, Karen's untimely disclosures necessitated another continuance. Accordingly, the court disallowed, as "wasted and unproductive," all 123 hours spent by Karen's counsel by the time of the ex parte in preparation for the aborted February 5, 2010 trial.

*(11)    Karen's March 12, 2010 ex parte application for payment of tuition*

The court found Karen was forced to file this urgent ex parte application after Marty refused to sign admission forms or—in violation of an extant court order—to pay half the cost of the children's private school tuition, until Karen agreed to bear other expenses. The court found that due to Marty's "hardball" litigation tactics, attorney fees

20

for the ex parte application were necessarily and reasonably incurred because the children were about to be kicked out of school.

   *(12) Karen's April 14, 2010 OSC re division of the life insurance policies.*

  This motion was a variant of a motion Karen filed months earlier when the parties anticipated a trial in early 2010. After the trial date was continued, Karen argued that she needed funds to pay a very large credit card debt for attorney fees and costs, and sought a bifurcated trial on this issue as alternate relief. The court found that Karen's "position was not wholly unreasonable as she had severe financial needs and only spousal support and child support as a source of income." "Predictably," however, Marty filed "a furious and massive response, since it was clear that this motion would directly challenge the sensitive issues" he had vigorously opposed before. Karen knew the issues raised by her OSC were ones to which Marty "was particularly sensitive." Thus, the court found the "necessity and motivation for this motion . . . questionable."

   *(13) Marty's motions regarding the children's passports and visitation*

  Marty used the occasion of the May 17, 2010 hearing on Karen's OSC regarding the insurance proceeds to bring an unrelated ex parte application regarding Father's day visitation, retention of the children's passports, and to seek modification of the court's visitation orders. The court denied Marty's nonexigent request, leaving the matters for resolution at trial.

  The day after his ex parte application was denied, Marty filed an OSC seeking modification of visitation orders, which was set for hearing on July 6, 2010. By his OSC, Marty also requested permission to take the children to Chicago in July for their paternal grandmother's 80th birthday celebration, and new procedures for handling passports.

  The parties were able informally to resolve the issue of travel for the grandmother's birthday. But the passport issue "escalated into a significant battle resulting in Karen filing an OSC regarding Contempt," after Marty refused to return the passports to Freid and Goldsman after an out of country trip he took with the children.

21

Karen argued that Marty's refusal to return the passports violated a 2008 order, a position with which Marty unsurprisingly took issue.

The court agreed that Marty's retention of the passports violated its January 16, 2008 order which required that the children's passports remain in the possession of Karen's counsel "'until further agreement of [the] parties or order of the court.'" Marty was given temporary possession of the children's passports after agreeing in writing to return them after a vacation. He reneged on that agreement. In his OSC, Marty argued the 2008 order was unenforceable because its requirement that Karen's counsel maintain possession of the passports ended when the parties reached a "further agreement," i.e., when they agreed Marty could temporarily retain the passports to take a trip with the children. The court found otherwise, concluding the parties had not "agreed otherwise" as to long-term possession of the passports. Marty's refusal to return the passports was unreasonable, and the legal fees Karen incurred to resolve this issue were reasonable and necessary.

*(14)    Unnecessary preparation time for miscellaneous tasks*

The court found that Freid and Goldsman either double-billed or unreasonably devoted excessive time preparing for Marty's deposition, the trial and qualified domestic relations orders. It reduced the recoverable fees billed for each of these tasks by specified amounts not relevant here.

*d.      The level of and necessity for experienced and skilled Family Law attorneys, and the responsibilities undertaken by Marty, and his and Karen's counsel*

The court noted that attorneys retained by each party were Family Law specialists with "the highest degree of certification and expertise in performing the specialized services involved in this case," whose hourly fees fell within the range of those customary and usual in family law cases. The court observed that although Marty was neither experienced nor certified in family law, he was a "formidable civil litigation specialist" who, notwithstanding his representation by very competent family law

22

specialists, "undertook direction and control of the entirety of the litigation," and was intensely involved at every level of the proceedings.

Marty argued that Karen's bills reflected an overutilization of partners to perform tasks more appropriately performed by associates and staff with lower billing rates. The court rejected this argument. Had this been "a simple form of litigation where the pace of the litigation [was] spread out in a normal timeline," the court might have agreed. However, Marty failed to take into account "the fact that this case required simultaneous legal work on many fronts by skilled and qualified Family Law attorneys to either defend or pursue many pretrial OSC's" and other motions.

The court acknowledged that the matters at issue in this dissolution action were not particularly complex and of no import beyond the parties. However, because of the high degree of contentiousness between the parties on numerous "sub-issues regarding custody and visitation and assets," many issues had "evolved into full-blown adversarial hearings" or were the subject of intricate and protracted negotiation and ultimate settlement. The sheer number and intricacy of matters at issue necessitated the employment of skilled, experienced Family Law specialists. Further, as an uncompensated attorney-client, Marty drove the costs of this case well beyond usual levels. He argued positions "most attorneys would not take and litigated the issues beyond what a reasonable attorney would do because he could do so without charge to himself . . . ." To counter Marty, Karen was forced to rely on "expert but compensated attorneys," which caused her legal bills to be much higher than they would ordinarily have been.

e.      *The significant disparity of income*

The court incorporated portions of its SOD from phase I relative to the parties' respective incomes, assets and expenses. It also incorporated the findings in that SOD relative to each party's needs, and its analysis of the section 4320 factors, all of which bore on its fee and cost award. The court observed that Marty's annual income, including bonuses, was $1,427,937 in 2010, and $1,970,776 ($164,231 per month), in 2011. In

23

stark contrast, Karen's earned income was $0 per month, and her imputed income was $1,904 per month (with slight increases in one year and again in six years). The parties' respective incomes evidenced an "enormous disparity" between them in terms of their respective ability to pay attorney fees and costs.

3.      *The court's conclusion*

In the end, the trial court found the case had been "aggressively over-litigated by both parties," though much more so by Marty who "exercised direction and control over the litigation and used his education, training, and considerable skills," repeatedly employing excessive litigation tactics and efforts. "[H]e sought relief and discovery that was at times overbroad, overreaching, tactical, borderline harassing, degrading to Karen, controlling, or involved illogical pairing or grouping of issues used as trade-off in settlement negotiations." Marty's retained Family Law attorneys lacked control, and were merely "a conduit" for Marty's unrestrained actions.

The court found that although some fees and costs billed by Freid and Goldsman were unreasonable or inappropriate, the majority were necessary and reasonable under the circumstances. Freid and Goldsman made some errors, but "those billing deficiencies in no reasonable way justified the protracted costly 11-day trial on the fee issue." Further, for the most part, the court found that experts employed by Marty "to undercut and devalue the fees and costs incurred by Karen were not credible." Those experts either lacked an appreciation for Family Law, or "failed to account for the extent to which Marty created litigation costs by his conduct." Further, in rendering their opinions, they relied on assumed hypothetical facts supplied by Marty that did not accurately portray the true facts.

In sum, "Marty's superior financial condition . . . combined with his aggressive pursuit of issues and litigation," created an "imbalance and inequality in the parties' relative circumstances resulting in a disparity in Karen's ability to equally match Marty in the litigation," and her "huge and unsatisfied bill for legal services." Accordingly, pursuant to sections 2030 and 2032, the court found Marty owed a substantial

24

contribution to Karen's fees and costs, "in order to equalize the positions of the party under all the circumstances cited in [the SOD] and in consideration of the support and property awards that the parties agreed to or were ordered in the" phase I SOD.

The court ordered Marty to pay $180,000 of Karen's attorney fees and $20,000 for forensic accountant costs, based on the total amount of her reasonably incurred fees. The court found that sum represented "a fair equalizing share of the reasonable and necessary fees incurred by Karen under all the circumstances." Responding to Karen's subsequent objections, the court acknowledged the "significant disparity between the incomes of the parties." It noted that if its "function was merely to allocate fees and costs without consideration of all the equitable factors," it might have changed its decision. But income disparity was "only one category [it] considered." The trial court stated that its "ultimate decision was reached after full consideration of all available information" in this case which had "involved significant waste, excessive billing, and an almost indifferent attitude on both sides as to the cost of litigation." The court was fully aware its conclusion meant Karen was "responsible for a large proportion of her own attorney's fees and costs," a result it deemed "reasonable."

4.      *The trial court's fee and cost award was not an abuse of discretion*

Karen contends that given the trial court's express finding that there was a significant disparity between the parties' financial conditions, it abused its discretion in awarding only $200,000 of the $958,790 in fees and costs reasonably incurred, rendering a judgment that only served to increase that disparity. Karen also maintains that the minimal fee award, made in the face of the court's findings that the manner in which Marty conducted litigation unnecessarily escalated her expenses, rewards Marty for his improper litigation tactics. We reject Karen's contentions.

A needs-based fee award must be "just and reasonable under the relative circumstances" of the parties. (§ 2032, subd. (a).) By tying the need determination to consideration of the parties' relative circumstances, section 2032 rejects the application of a numerical standard. (*In re Marriage of O'Connor*, *supra*, 59 Cal.App.4th at p. 883.)

25

The primary focus is on what is "reasonably necessary" to adequately maintain or defend the proceeding. (§§ 2030, subd. (a)(1), 2032, subd. (b); *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 446–447; see *Keech*, *supra*, 75 Cal.App.4th at p. 870; *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 167.)

To determine the appropriate amount of a section 2030 needs-based fees and costs award, the court applies the same statutory standards governing the threshold decision whether to make the award—i.e., it considers what is "just and reasonable" under the parties' "relative circumstances" and bases its determination on the parties' respective incomes and needs, and any factors affecting their respective abilities. (§§ 2030, subd. (a)(2), 2032, subds. (a), (b).) The court must take into consideration the need for a award to enable each party to have sufficient financial resources to present his or her case adequately. In assessing a party's relative need and the other party's ability to pay, the court is to take into account "'"all evidence concerning the parties' current income, assets, and abilities."'" (*Dietz*, *supra*, 176 Cal.App.4th at p. 406.) Financial resources are only one factor to consider. (*Ibid.*) The court may consider the parties' trial tactics (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1314), together with the factors outlined above.

No matter how long it takes to litigate a controversy or fee issue, the ceiling on an appropriate needs-based award is the amount "reasonably necessary" to handle the matter properly. (§ 2030, subd. (a)(1).) Nevertheless, courts may appropriately limit or deny fee awards to the extent a case has been overlitigated in light of matters at issue. (*In re Marriage of Huntington* (1992) 10 Cal.App.4th 1513, 1524; *Keech*, *supra*, 75 Cal.App.4th at p. 871.)

Relying on *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, Karen argues reversal is required. *Fransen* involved an initial support order. The appellate court was able to determine that the trial court's order awarding $70 per month of spousal support to the wife was based solely on the wife's needs as calculated by subtracting the difference between her monthly expenses ($415) and monthly income ($345). The court

found this mechanical calculation effectively ignored other factors the court was required to consider in setting spousal support, e.g., the length of the parties' marriage (23 years), the wife's lack of job skills and the disparity in incomes. (*Id*. at pp. 423–425.) No similarly mechanical calculation was employed here. On the contrary, the court exhaustively discussed the relevant factors to determine the propriety and amount of a needs-based fee award.

Karen also relies on *Braud*, *supra*, 45 Cal.App.4th 797, in which the wife reasonably incurred approximately $9,300 in legal fees, of which the court awarded her only $500. (*Id*. at p. 826.) To paraphrase *Braud*, we agree that the record here "contains overwhelming evidence that, at the time of the trial court proceedings, [Karen] had no assets other than her share of the family home, no income other than [] support, and only the most minimal earning ability. [Marty], on the other hand, had substantial income [and] few expenses . . . ." (*Id*. at p. 827.) In *Braud*, the court found no apparent reason for the trial court's decision to make a fee award "so grossly disproportionate to those actually charged to [the wife]." (*Id*. at pp. 827–828.) Here, by contrast, the trial court considered the relevant statutory factors and made a reasoned, albeit similarly harsh, decision.

It is true the court did not specify how it determined $200,000 was a reasonable amount for Karen's fees and costs. No doubt another court could justify a higher needs-based fee award for Karen given the significant gap in the parties' respective financial circumstances. But that is not the dispositive question. The relevant inquiry is whether the order at issue is one *no court* reasonably could have made under all the relevant circumstances. (*Dietz*, *supra*, 176 Cal.App.4th at p. 406.)

Here, the trial court specifically and appropriately noted that financial disparity was just one category it was bound to consider. It is clear from the SOD that the court also took into account such factors as Karen's role—albeit lesser than Marty's—in prolonging and escalating the litigation, i.e., her lack of preparedness for trial, belated production of multiple expert's reports, filing of certain motions that were either

27

unnecessary (requesting to take the children on the same Tahitian trip as Marty had planned) or that she knew would raise divisive issues that were unlikely to be resolved without more litigation (essentially twice filing the same motion regarding the insurance funds). Although Karen, like Marty, was within her rights to litigate this matter as she saw fit, the court acted properly in taking both parties' conduct into account. Further, although the fees owed to the Phillips firm were not directly at issue in phase II, the court could reasonably consider that Marty's $15,000 settlement with that firm also benefitted Karen by relieving her of the potential obligation to pay significant additional fees. Under all the circumstances, the court concluded that, notwithstanding the huge disparity in the parties' financial circumstances, it was not unreasonable to require Karen to shoulder "a large proportion of her own attorney's fees and costs." We can discern no abuse of discretion on this record. The court had statutory authority to make an award of attorney fees and costs based on the relative circumstances of the parties. (§ 2032, subd. (a).) Although the SOD does not specify calculations it used to arrive at this number, the seasoned trial judge concluded that $200,000 was "just and reasonable." The court is free to "employ its own experience in fixing the amount of the award." (*In re Marriage of Dick*, *supra*, 15 Cal.App.4th at p. 167.) Finding no abuse of discretion, we must affirm.

5.      *The trial court did not err in refusing to award sanctions under section 271*

Karen asserts that, by refusing to make a sanctions award under section 271, the trial court essentially rewarded Marty for his improper litigation tactics. We cannot agree.

Section 271 authorizes an award of attorney fees and costs when a party's conduct frustrates settlement and increases litigation costs. (§ 271; see, e.g., *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 177.) The policy of section 271—to encourage settlement and reduce the costs of litigation—is clear. (§ 271, subd. (a); *In re Marriage of Quay* (1993) 18 Cal.App.4th 961, 970.) To facilitate that policy, the statute provides that the court may base an award of attorney fees and costs—in the nature of a sanction— "on the extent to which the conduct of each party or attorney furthers or frustrates the

28

policy . . . to promote settlement of litigation and, where possible, to reduce litigation costs by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).) The party requesting sanctions under section 271 need not demonstrate financial need for the award. (§ 271, subd. (a).)

We review a sanction order under section 271 for abuse of discretion. (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 652.) We indulge all reasonable inferences to uphold the court's order which will be reversed only if, considering all the evidence viewed most favorably in support of its order, no judge reasonably could have made such an order. (*Id*. at pp. 652–653.) The burden is on the complaining party to establish abuse of discretion. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) The showing on appeal is insufficient if it presents a state of facts which does nothing more than afford an opportunity for a difference of opinion. (*In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 138; *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

Throughout the SOD the court frequently singled out Marty's conduct for criticism. In the end, however, it found the case was "aggressively over-litigated by both parties," and expressly referred to the "significant waste, excessive billing, and almost indifferent attitude on both sides as to the cost of litigation." In denying Karen's request for sanctions under section 271, the court observed that the "case was hard fought on *both sides*" and revealed a "*mutual almost indifferent attitude toward escalation of the fees and costs*." (Italics added.) That cavalier conduct, however, "was mitigated by the fact that the parties did settle the vast majority of the issues in the case and limited the issues to be tried." Accordingly, the court found that no sanctions were in order. Viewed, as it must be in the most favorable light, this express finding (and all findings implied therein based on the evidentiary record, reflects the trial court's conclusion that Karen had shared responsibility for the ongoing litigation and escalation of the fees and that, in the end, the parties were able to reach accord on most issues. We conclude the trial court did not abuse its discretion in refusing to award sanctions under section 271.

29

## II. *Marty's cross-appeal*

*1. The trial court's authority to award Karen more than $75,000 in attorney fees*

At issue here is the fact that on December 5, 2008, Karen filed an OSC seeking, among other things, $234,000 for attorney fees incurred during the preceding year, and prospective attorney fees of $75,000. (§§ 2030, 2031.) Adjudication of the OSC was continued to phase II of the proceeding. Karen filed no further motions or requests for section 2030 fees.

Marty argues that Karen's recovery for attorney fees incurred after December 5, 2008, is limited to the $75,000 requested in the December 2008 OSC, because a noticed motion or OSC is a prerequisite for recovery of fees—both the initial request and any subsequent effort to augment or modify a prior request—under section 2030. Marty also contends Karen was precluded from seeking recovery of any fees incurred by Freid and Goldsman the year before the December 5, 2008 OSC was filed. Karen maintains she preserved her right to seek past and prospective attorney fees, put Marty on notice of her intent to do so, and placed the matter at issue, by checking a box on her January 2, 2007 petition for dissolution requesting that "Attorney fees and costs [be] payable by" Marty. Karen is correct.

"[T]rial courts . . . have a duty at the conclusion of the case to make a just and reasonable award of attorney fees and costs, considering the circumstances of the parties." (*In re Marriage of Green* (1992) 6 Cal.App.4th 584, 593.) An interim pendente lite proceeding seeking attorney fees to cover litigation expenses does not prejudice a party's right to obtain a later fee award in connection with the judgment. (*Id.* at pp. 592–593.)

Section 2030, expressly empowers the court to make fee and cost awards for legal services as necessary "during the pendency of the proceeding" (subd. (a)), or "rendered . . . before or after the commencement of the proceeding," "including after any appeal has been concluded." (§ 2030, subds. (a)–(c).) Fee awards made at the conclusion of a proceeding for legal services rendered or fees incurred during a

30

proceeding are, by definition, retroactive in nature. There is nothing in section 2030 that specifies when a party must seek an award for litigation expenses. Nor does the Family Code require that every request for fees and costs incurred before trial be made before trial. Section 2031 permits—but does not require that—a request for a "temporary order" may be made in advance of trial. Nothing in section 2030 or 2031 prevents a party from waiting until trial, or even "subsequent to entry of a related judgment," to seek payment for reasonably incurred fees.

Marty's assertion that Karen was required to file additional noticed motions, is also mistaken. A party must formally request—by written or oral motion or OSC—a "*temporary order* making, augmenting, or modifying an award of attorney's fees." (§ 2031, subds. (a), (b), italics added.) There is no requirement that such a request be pending in order for the court, at the conclusion of the proceedings, to make a needs-based attorney fees order covering the entire pretrial period.

Karen's respondent's brief accurately traces the development of State law on this point. Suffice it to say that since 1953, case and statutory law consistently have provided family law courts the power to award attorney fees and costs for past and prospective legal services. (See former Civ. Code, § 137.3 [substantially reenacted without substantive change as former Civ. Code, § 4525, which became Civ. Code, §§ 4370, subd. (a) & (b), now Fam. Code, §§ 2030 & 2031]; see also *Middlecoff v. Middlecoff* (1958) 160 Cal.App.2d 22, 26–27; *Gideon v. Gideon* (1957) 150 Cal.App.2d 349, 353–354; *Perry v. Superior Court* (1970) 7 Cal.App.3d 236, 243.)[10]

---

[10] Marty's assertion that *Warner v. Warner* (1950) 34 Cal.2d 838, and *Wilson v. Wilson* (1948) 33 Cal.2d 107, remain "good law" and support his contentions that a motion or OSC seeking fees must be filed before services are rendered because fee awards are "necessarily prospective in nature," is mistaken. Both cases were superseded by statute. (See 1953 amendment of former Civ. Code, § 137.3, Stats. 1953, ch. 6.20, § 1, p. 1864.)

The trial court was vested with and appropriately exercised the power to order Marty to pay fees and costs in excess of the $75,000 sought in Karen's 2008 OSC.

2. *Indemnity Agreement*

As noted above, on August 24, 2007, the court ordered Marty to contribute $50,000 for Karen's legal fees to be paid directly to the Phillips firm. Marty paid the Phillips firm only $35,000 of that amount. The Phillips firm's *Borson* motion sought $256,226 from Marty for legal services bills owed by Karen. Resolution of that motion was continued to trial.

On January 16, 2008, Karen and Marty signed a stipulation that, in pertinent part, required: Marty to "pay the remaining $15,000 of his contributive share of [Karen's] attorneys fees directly to [Karen] . . . . This payment shall discharge the Court's prior order of August 24, 2007 re contributive share. [Karen] shall indemnify [Marty] against any claims made by [the Phillips firm] against [Marty] for said $15,000."

Prior to trial Marty and the Phillips firm settled the *Borson* motion. Their written agreement provides:

"D. [The Phillips firm] has a current account receivable due from Karen in the amount of $255,595 for fees, $19,162.36 for costs, and interest through Nov. 14, 2011 of $113,012.81.

"E. [The Phillips firm] has asserted a claim against Marty for the balance due for fees and costs incurred by Karen as set forth in paragraph D above, a portion of which consists of the remaining $15,000 of Marty's contributive share of Karen's attorneys fees and costs which he was ordered to pay in . . . the Court's August 24, 2007 Order After Hearing; and [the Phillips firm] has also asserted a claim for additional fees and costs of [the Phillips firm] incurred by Karen in connection with the *Borson* motion, even though such fees and costs were not claimed in the *Borson* motion itself.

"F. [Marty] contends that the $15,000 that he is paying to [the Phillips firm] to settle the *Borson* motion, as set forth hereinbelow, as well as any additional fees and costs of [the Phillips firm] incurred by Karen thereafter, whether or not included in the

32

*Borson* motion, is solely for the remaining $15,000 of his contributive share of Karen's attorneys fees and costs which he was ordered to pay . . . . *[The Phillips firm] does not agree with such contention and nothing contained herein shall prevent Karen from contesting such contention and/or asserting that the $15,000 should be allocated differently.*"  (Italics added.)

At the phase II trial, Marty argued the court should enforce the parties' January 16, 2008 stipulation by offsetting any fees he was required to pay on Karen's behalf by $15,000.  In response, Karen argued that Marty had not proved that the purpose of his payment of the $15,000 to the Phillips firm had been to satisfy the 2007 fee order.  She pointed to the fact that, although the *Borson* motion encompassed the $15,000 remaining from the original 2007 award, it sought much more than $15,000.  She also noted that the Marty's settlement agreement with the Phillips firm specifically left open the question of what the Marty's $15,000 payment represented, and whether she had to indemnify him.

The trial court rejected Marty's representation that his payment to Karen was meant to satisfy the 2007 order, as to the remainder of the $50,000 owed.  It overruled his objection to the SOD on this ground, stating:

"Karen's prior attorneys charged her substantial fees and costs . . . .  Those fees are not at issue in this decision as the . . . *Borson* motion that was pending relative to those fees was settled resulting in a release of both Marty and Karen from any liability beyond the $15,000 paid.  Marty, however, argues that the court should in effect reduce any fees awarded by this decision by awarding him $15,000 as indemnity as he paid to settle [the Phillips firm's] claim against Karen and Marty.  The court finds no equitable basis for any such indemnification, offset or credit.  Although Marty obtained a very beneficial reduction of the fees that Karen owed and thereby clearly benefitted Karen by obtaining release of her legal liability to [the Phillips firm], it is *equally clear that Marty thereby avoided his own liability on the Borson motion which, based upon the relative financial circumstances of the parties, . . . benefitted him far in excess of what he paid as it is clear that [the Phillips firm] could have secured a substantial contribution directly*

33

*from Marty*. Thus, the court declines to offset or credit the amount due under this decision by the amount paid to [the Phillips firm]." (Italics added.)

On its face the settlement agreement between Marty and the Phillips firm leaves open the question of the purpose of the $15,000 payment and whether Karen was required to indemnify him. The trial court was entitled to disbelieve Marty's testimony (no other witness testified to buttress Marty's interpretation of the agreement). Witness credibility is subject to substantial evidence review, which requires that we resolve "all factual conflicts and questions of credibility in favor of . . . the prevailing parties." (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc*. (2005) 129 Cal.App.4th 1228, 1265; see *In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135 ["Under the substantial evidence rule, we have no power to pass on the credibility of witnesses . . . ."], disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748 & fn. 6.) Substantial evidence supports the trial court's determination that Karen was not required to indemnify Marty for the $15,000 he paid the Phillips firm. "[W]e defer to the trier of fact on issues of credibility. [Citation.] '[N]either conflicts in the evidence nor "'testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" [Citations.]'" (*Lenk v. Total–Western, Inc*. (2001) 89 Cal.App.4th 959, 968.) Accordingly, the trial court's order must be affirmed.

3.      *Enforcement of Karen's waiver*

The question of whether Karen waived her claim for fees incurred by Freid and Goldsman arose when the phase II trial first began in December 2011 and the firm's billing statements—identified as exhibit 128—were offered into evidence. Martin objected to the admission of portions of that exhibit on the ground he had not received bills for September 27 through November 25, 2011 until the week before. He needed 60 days for his expert to analyze them.

34

A colloquy ensued after which the court stated:

" . . . obviously we are here for trial. There is an ongoing legal representation here by [Karen], so I mean obviously bills are expected to be—continued to be generated.

" . . . either I would allow this to go into evidence or I would reserve on the last segment of bills and charges for a different day.

" . . . I agree with you that from [Marty's] point of view that fairness would require that since you are analyzing all of these other bills with your expert, that you have the opportunity to do that.

" . . . I think tentatively I would exclude them for this trial, but reserve on the issue of the attorney's fees claimed in that particular segment. And I would admit the rest of the bills up through, but excluding September of '11. So the last bill before September '11 would be August 26th of 2011.

" . . . So I will admit a portion of Exhibit 128, the bills from 1/12/08 through and including August 26, '11. And we will reserve on the other issue and decide what to do before the end of the case. So [exhibit] 128 is partially admitted."

On March 14, 2012, during a hiatus following the first three days of trial, the parties met with the trial judge for an in camera trial setting conference. That conference was not reported. According to a minute order issued afterwards, the parties stipulated that "[Karen] waives her right to seek fees/costs from [Marty] for the period that postdates the period covered by her last production of billing invoices—the date when the invoices produced at trial is not clear, but is subject to proof by looking into the court exhibits." The remainder of trial, then forecast to last three more days, was scheduled for April 23, 24 and 25, 2012. On April 3, 2012, when it was still anticipated trial would resume within a few weeks, Karen's counsel, Mel Goldsman filed a declaration in response to an OSC by Marty. In that declaration Goldsman stated that the "parties agreed that . . . [Karen] would waive her right to seek attorney's fees or costs from [Marty] at the upcoming fee trial for any time period after the time period captured by invoices produced to [Marty] prior to . . . November 25, 2011 . . . ."

35

The phase II trial did not resume until July 9, 2012, and concluded after a total of 12 days (including one for argument), not the six originally anticipated.

Marty argues that by the March 14, 2012 stipulation, Karen agreed to forgo seeking recovery for any fees incurred by Freid and Goldsman after August 26, 2011 through the end of the phase II trial. As a result, he maintains that the trial court erred in interpreting the stipulation to limit Karen's fee waiver to recovery of fees incurred only through three additional (six total) days of trial.

This issue arose again when trial resumed in July. Karen's counsel sought relief from the stipulation, in light of the fact that the trial had not proceeded in April as scheduled. The court observed that the stipulation was binding, but said it would "consider all that happens during this trial, and . . . issue that as part of [its] order. . . . [I]t's an issue that [the court will] decide here as part of this trial . . . ."

In its September 6, 2012 proposed SOD the trial court said it would reserve jurisdiction on the issue of fees incurred after August 25, 2011. Both parties addressed the issue in objections to the court's tentative SOD.

After considering the parties' arguments the trial court issued a final SOD by which it reserved jurisdiction on the question of whether either party should be required to pay section 2030 fees or costs incurred after August 25, 2011. The court noted its reservation of jurisdiction was limited to the question of whether, by the March 14, 2012 waiver, Karen's attorneys intended to forgo recovery of any fees incurred after August 25, 2011 indefinitely. It found they did not. Rather, it concluded that:

"In order to expedite the fee trial Freid & Goldsman appeared in this court on 03/14/2012 and to avoid further prolongation of the discovery related to the fee issue and to preserve then scheduled trial waived any request for fees and costs incurred for the period for which bills and costs had not been produced prior to the date of that hearing. The evidence indicated that the cut-off date for production of bills and costs was 8/25/2011. The court understood at that time that the fees and costs were permanently waived and that the waiver was based upon Freid & Goldsman's understanding that the

36

three days then scheduled for trial in [April] 2012 would be sufficient for both sides to present their cases. The court does not believe that the waiver extended to include attorney time and costs beyond the date then contemplated for the completion of the fee trial—three days of trial and post-trial completion of judgment. Since the court trial extended five days longer than was reasonably foreseeable, the court reserves jurisdiction to award fees and costs for the last 5 days of the attorney's fees and costs trial. Any waiver ends at the end of the third day of trial 7/11/2012. Thus [Karen] may seek to recover for fees and costs incurred for the dates of 07/12/2012 and thereafter including trial dates on 7/13, 7/25, 7/26, and 7/27 excluding the time required to complete the judgment including objections to the statement of decision and related fees and costs."

The language of the March 14, 2012 agreement is unclear as to the time frame encompassed by the words "the upcoming fee trial." The court did not abuse its discretion by interpreting Karen's agreement waiving the right to seek recovery of fees through the end of the phase II trial, as anticipated by the court and the parties at the time the agreement was made; i.e., at the end of April. The trial court resolved the uncertainty by giving effect to the waiver for 10 months (Aug. 26, 2011–July 11, 2012), i.e., all but the final five days of trial. We accord great weight to the learned trial judge's interpretation of unrecorded events and discussions occurring in his chambers, and reject Marty's contention that the court lacked the authority to interpret the waiver. Interpretation of agreements to give effect to the parties' intentions is a function properly and commonly performed by courts. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921; *In re Marriage of Facter* (2013) 212 Cal.App.4th 967, 979 ["ambiguous or uncertain provision of a contract 'must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it,'" citing Civ. Code, § 1649].)[11]

---

[11] Karen's motion to strike certain portions of Marty's cross-appellant reply brief is granted. The brief raises issues not addressed in the cross-appellant's opening brief

## DISPOSITION

The postjudgment order is affirmed. Both parties to bear their own costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

and unnecessary for the resolution of this appeal. Accordingly, we disregard portions of pages 1 through 4, 12 through 13, 17 and 21 of cross-appellant's reply brief, as highlighted in exhibit 1 to the motion to strike.